UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LONNIE BLACKWELL,<br><br>*Plaintiff*,<br><br>v.<br><br>CITY OF BRIDGEPORT, JOSEPH GANIM, MAYOR OF THE CITY OF BRIDGEPORT, IN HIS OFFICIAL CAPACITY, AND REBECA GARCIA, ACTING POLICE CHIEF OF THE CITY OF BRIDGEPORT, IN HER OFFICIAL CAPACITY,<br><br>*Defendants*. | Civil No. 3:21-cv-778 (JBA)<br><br>August 30, 2023 |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Lonnie Blackwell is an African American man who holds the rank of Captain in the Bridgeport Police Department (BPD). On June 7, 2021, he filed a lawsuit alleging retaliation in violation of 42 U.S.C. § 1981, made actionable pursuant to 42 U.S.C. § 1983, against Defendants City of Bridgeport and acting Chief of Police Rebeca Garcia and Mayor Ganim, both in their official capacities. Garcia was appointed Assistant Chief of the BPD on December 19, 2019, and acting Chief of Police on September 10, 2020.[1] (Compl. [Doc. # 1].) On July 20, 2020 Plaintiff filed an internal complaint against then-Assistant Chief Garcia claiming harassment and race discrimination. (Pl.'s Ex. 1 [Doc. # 37-4].) On February 8, 2021, he filed an administrative complaint against Bridgeport with the Connecticut Commission on Human Rights (CHRO) and Equal Employment Opportunity Commission (EEOC). (Pl.'s Ex. 30 [Doc. # 37-33].) The one-count Complaint alleges unlawful retaliation on account of Plaintiff's protected activity opposing racial discrimination and retaliation in his internal complaint and his administrative complaint.

---

[1] Garcia left the BPD in 2022.

1

Actions which Plaintiff contends were retaliatory include:

- Imposing restrictions on Plaintiff's use of overtime throughout Garcia's time as Acting Chief, including new restrictions promulgated on September 25, 2020, which were not applied evenly throughout the department.
- Not responding to his January 2021 request to be allowed to participate in an executive briefing on the presidential inauguration day planning. (Compl. ¶ 35.)[2]
- Ordering Plaintiff's transfer on January 13, 2021 from the Patrol division to Administrative Services division where he supervised far fewer staff. (*Id.* ¶¶ 38, 44-46, 49- 50.)
- Expanding an Internal Affairs investigation of alleged excessive force by another police officer that occurred while Plaintiff was off duty in August 2019 to include Plaintiff, which led to a notice of charges against him on May 12, 2021 (*id.* ¶¶ 51-69) and a loss of five departmental holidays imposed as discipline by Garcia on August 6, 2021.
- Denying Plaintiff's request for a personal printer in his office in Community Services, and removal of cable TV from the Community Services Offices, both in February of 2021.[3]

I. **Factual Background**

　　A. **Internal Complaint**

On July 20, 2020, Plaintiff filed an internal complaint with the Bridgeport Police Department alleging discrimination and harassment by then-Assistant Chief Garcia for

---

[2] Plaintiff offers no basis for how this particular incident constitutes an adverse action.
[3] Plaintiffs also alleges that Garcia's alleged mistreatment of him with regard to Command Staff ("Compstat") meetings (Compl. ¶¶ 33-34) was retaliatory, but such conduct preceded all his protected activity and so cannot support a claim for retaliation.

speaking to him in a hostile manner and frequently interrupting him in the weekly command staff ("Compstat") meetings attended by BPD leadership, particularly at one Compstat meeting where Garcia cross-examined Plaintiff on his opposition to the arrest of demonstrators at the Christopher Columbus statue in Bridgeport. (Defs.' Loc. Rule 56(a) Stmt. of Facts (SOF) [Doc. # 30-5] ¶ 7.) He also claimed that on July 16, 2020, Garcia sent him accusatory texts and was hostile to him on the phone.[4] (*Id.*)

### 1. Overtime Usage by Patrol Captains

On September 10, 2020, Garcia was appointed Assistant Chief of the BPD. She was tasked with significantly reducing overtime costs, the latest in a succession of BPD chiefs attempting to reduce overtime costs that exceeded the department's overtime budget. (*Id.* ¶¶ 10-14.) On September 25, 2020, Garcia issued BPD Departmental memo no. 20-128 imposing certain overtime restrictions and requiring her prior approval of requests for overtime outside of the circumstances listed in the memo. (*Id.* ¶ 15.) Garcia also ended the practice of patrol captains being paid for receiving and responding to phones call, texts, and emails while off duty. (*Id.* ¶¶ 46-47.)

From early 2019 to mid-2020, there were three captains in the Patrol Division[5]: Blackwell, Lougal, and Masek. (*Id.* ¶ 19.) While Armando Perez was Chief, the captains largely

---

[4] This conduct predates Plaintiff's internal complaint and cannot be the basis for a claim of retaliation.

[5] The main function of the uniformed Patrol Division is to provide law enforcement patrol and related services to the residents of the City of Bridgeport 24/7, including protecting life and property, enforcing laws, preserving the peace and public order, and apprehending criminal suspects. (*Id.* ¶ 102.) BPD Captains in the Patrol Division work an operational schedule of 5 days on and 3 days off (5/3). (*Id.* ¶¶ 16, 18.) The operational schedule has three shifts: the "A" shift is from 11:00 p.m. to 7:00 a.m. (or from midnight to 8:00 a.m.); the "B" shift, also known as the day shift, is from 7:00 am. to 3:00 p.m. (or from 8:00 am. to 4:00 p.m.); and the "C" shift is from 3:00 p.m. to 11:00 p.m. (or from 4:00 p.m. to midnight). (*Id.* ¶ 17.) When a captain is not on duty, on-duty patrol lieutenants act in the captain's place. (*Id.* ¶ 30.)

3

were assigned to the "B" shift, but at times were assigned to other shifts. (*Id.* ¶ 21.) During this time, all patrol captains generally attended weekly Compstat meetings, and if those meetings occurred while a patrol captain was off duty, that captain would receive overtime pay of time and one-half their regular hourly rate for attending. (*Id.* ¶¶ 22-23.)

On January 24, 2020, Chief Perez issued an order assigning Capt. Masek to the "B" (day) shift, Capt. Lougal to the "A" (overnight) shift, and Blackwell to the "C" shift. (*Id.* ¶ 25.) Subsequently, patrol captains not on duty during the time of a Compstat meeting were not permitted to attend on overtime. (*Id.* ¶ 26.) About a month or two later, all patrol captains were changed back to the day ("B") shift. (*Id.* ¶ 27.)

At the time Garcia became Acting Chief in September 2020, Blackwell and Lougal were the patrol captains[6], and both were on "B" shifts and patrol lieutenants were the commanders on the "A" and "C" shifts. (*Id.* ¶¶ 28-29.) When Lougal and Blackwell were assigned to the "A" and "C" shifts, respectively, patrol lieutenants supervised the "B" shift. (*Id.* ¶ 33.) Chief Perez had allowed Lougal and Blackwell to "backfill" one another's shifts on days where the other was off or absent, but Garcia states she stopped allowing such backfilling since lieutenants already consistently filled in for captains during certain shifts, and there was no reason that a captain needed to use overtime to backfill a shift when another captain was off or absent. (*Id.* ¶¶ 31-32, 34.)

At that time, the BPD had five captains: two in the Patrol Division and one each in Community Services, the Detective Bureau (DB), and Special Services. (*Id.* ¶ 35.) While former Chief Perez had allowed off-duty patrol captains to respond on overtime to shootings and other serious crime scenes, Garcia restricted Captains Lougal and Blackwell's off-duty responses to serious crime scenes. (*Id.* ¶¶ 41-42.)

---

[6] Captain Masek retired in June 2020. (Blackwell Aff. [Doc. # 37-1] ¶7.)

### 2. Plaintiff's Transfer to Administrative Services

On January 18, 2021, Garcia significantly restructured the leadership of the BPD, transferring the five BPD captains to new divisions, and moving the Community Services division from the operations side of the BPD (overseen by Deputy Chief Armeno) to the support services side of the BPD (overseen by Deputy Chief Baraja). (*Id.* ¶¶ 49-50.) Capt. Fitzgerald was transferred from the Detective Bureau to Patrol, Capt. Gilleran was transferred from Special Services to the Detective Bureau and Emergency Services Unit, Capt. Lougal was transferred from Patrol to Special Services, Capt. Porter was transferred from Community Services to Patrol, and Capt. Blackwell was transferred from Patrol to Administrative Services. (*Id.* ¶ 50.) Administrative Services includes the Community Services division.[7] (*Id.* ¶¶ 51, 54.) The transfer order also placed the Community Services division under Deputy Chief Baraja. (Pl.'s Ex. 7 [Doc. # 37-10].)

In terms of manpower, Patrol is by far the largest division and Community Services requires far fewer officers. The captain in Administrative Services supervises far fewer officers than either of the captains in the Patrol Division. (SOF ¶ 105.) The Records room, the property room, permits, the garage, and alarm administration were also added to Blackwell's command within Administrative Services by Garcia upon his transfer – Blackwell viewed these areas of operation as not requiring a captain's oversight. (*Id.* ¶ 106.) He states that since his subsequent transfer to Special Services, a captain has not been assigned to Administrative Services. (Blackwell Aff. ¶ 52.)

---

[7] The Community Services Division engages with residents, businesses, and groups to maintain and improve the department's communication and relationships with community groups and residents and foster a positive BPD image. (SOF ¶ 103.)

5

### B. CHRO and EEOC Complaints

On February 3, 2021, Plaintiff filed an unlawful retaliation complaint against the City of Bridgeport with the CHRO and EEOC. (Pl.'s Ex. 30.)

#### 1. Denial of Cable Television and Printer

In February 2021 the cable television, cable and box in the Community Services office were removed, and the cable TV subscription either cancelled or not renewed. (SOF ¶¶ 81-83.) Blackwell maintained that having basic cable in the office was important so that officers could watch local news to keep informed of local events, but Garcia disagreed. (*Id.*) Garcia also denied Blackwell's request to have a printer in his office. (*Id.* ¶ 79.) Blackwell states that the Patrol division retained its cable TV access. (Blackwell Aff. ¶ 32.)

#### 2. Continued Overtime Disputes

After the captain transfers occurred, on July 17 or 18, 2021, Deputy Chief Baraja told Garcia that he had been informed Capt. Fitzgerald and perhaps other captains were working overtime without her required pre-approval. (SOF ¶¶ 69-70.) Garcia spoke with Deputy Chief Armeno, who denied authorizing Fitzgerald's overtime, but said he would look into the matter. (*Id.* ¶ 71.) On July 19, 2021, Garcia sent an email to all five captains copying both deputy chiefs stating that it had come to her attention overtime was being worked without requests coming to her and being approved, that that practice had to stop immediately, and reiterating that no overtime was to be incurred without appropriate authorization. (*Id.* ¶ 72.)[8]

Garcia denied almost all requests from Community Services personnel to attend community events on overtime, and instead offered Blackwell and other Community

---

[8] The parties disagree as to whether Captain Fitzgerald continued to work overtime following this email. (Pl.'s Loc. R. 56(b) Stmt. (SOF Resp.) [Doc. # 37] ¶ 73.)

Services personnel the option of adjusting their work schedules by taking time off during their regular workweek so that they could use that time to attend community events on weekends or evenings without incurring overtime. (*Id.* ¶¶ 74-75.)

### 3. Disputes over School Resource Officers (SROs)

When Capt. Porter was the commander of Community Services (CS), school resource officers (SROs) were under his command; there were 4 SROs when Blackwell replaced Porter. (*Id.* ¶¶ 91-92.) On October 18, 2021, Garcia received an email from Bridgeport Superintendent of Schools Michael Testani, copied to Bridgeport Mayor's Chief of Staff Dan Shamas and City Chief Administrative Officer Janene Hawkins, complaining that Blackwell had not communicated to him that a high school had been placed in lock in/lock out status. (*Id.* ¶ 95.) On October 29, 2021, Garcia received another email from Superintendent Testani setting forth a litany of issues and concerns he had about Blackwell and requesting "a new point of contact within the command of the SRO division be put in place." (*Id.* ¶ 96.) Garcia states that on October 29, 2021 she met with Shamas and Hawkins regarding the Superintendent's concerns, and was directed to move the SROs from Blackwell's command to Garcia's. (*Id.* ¶¶ 97-98.)[9] That day, Garcia issued Departmental Memo no. 21-132 to all commands that effective immediately school resource personnel (SROs) would be assigned to her office. (*Id.* ¶ 99.)[10]

Following the retirement of Captain Lougal on May 21, 2022, who had been commander of Special Services, Plaintiff accepted an offer to be transferred to Special Services (which includes the traffic, parking, K-9, marine, animal control and crime analysis units). (*Id.* ¶

---

[9] Plaintiff does not dispute the fact that Superintendent Testani complained to Garcia about his behavior.

[10] Garcia assigned Lieutenant Gretch to manage the SROs. Plaintiff contends Gretch had previously usurped command of the SROs from the start of his transfer to Administrative Services. (Pl.'s SOF Resp. ¶ 100.)

110.) Capt. Blackwell continued to serve as Captain of Special Services as of the time of this motion. (*Id.* ¶ 111.)

### 4. Office of Internal Affairs (OIA) Investigation

An excessive force incident involving Sgt. Capozziello and Lieut. Robinson occurred on August 16, 2019, which was referred by then Chief Perez to the BPD Office of Internal Affairs (OIA) for investigation. (*Id.* ¶ 112.) Sgt. Klesyk was assigned as the OIA investigator, and on July 20, 2020 Blackwell was interviewed for the investigation about his response to the incident, including communications he had with a civilian named Louis Rinaldo, who arrived on the scene of the incident driving Robinson's police car. (Pl.'s Ex. 25 [Doc. # 37-28] at 5-6.) Sgt. Klesyk's report made various findings including sustaining charges of policy violations against Blackwell as well as against Capozziello and Robinson. The charges against Blackwell focused on his communications with Rinaldo to conduct police functions. (*Id.* at 8.) On May 12, 2021, Garcia gave Blackwell written notice of charges against him, and on June 2, 2021, a Loudermill hearing was held. (SOF ¶ 116.) Two months later, on August 6, 2021, Garcia found Blackwell in violation of department policy by allowing Mr. Rinaldo to engage in police activities and imposed discipline on Blackwell in the form of a loss of five departmental holidays. (Garcia Aff. [Doc. # 30-2] Ex. H.)

## II. LEGAL STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 71–72 (2d Cir. 2016). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016). In assessing the record to determine whether there are disputed issues of material

fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." *LaFond v. Gen. Physics Servs. Corp.*, 50 F.3d 165, 175 (2d Cir. 1995). Where "reasonable minds could differ as to the import of the evidence," the question must be left to the finder of fact. *Cortes v. MTA N.Y. City Transit*, 802 F.3d 226, 230 (2d Cir. 2015).[11]

"Claims for retaliation under Title VII are analyzed at the summary judgment stage under the *McDonnell Douglas* framework, as are similar claims under section 1981 and CFEPA." *Callahan v. City of New Haven Bd. of Educ.*, No. 3:17-CV-00617 (JAM), 2019 WL 6918516, at *7 (D. Conn. Dec. 18, 2019). To establish a prima facie case of retaliation, a plaintiff must demonstrate that "(1) [he] was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). "If the plaintiff meets this burden and the defendant then points to evidence of a legitimate, non-retaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is incomplete or merely a pretext for impermissible retaliation." *Callahan*, 2019 WL 691 at *7.

"When a case turns on the intent of one party, as employment discrimination and retaliation claims often do, a trial court must be cautious about granting summary judgment." *Dickens v. Hudson Sheraton Cor*p., LLC, 167 F. Supp. 3d 499, 509 (S.D.N.Y. 2016), *aff'd*, 689 F. App'x 670 (2d Cir. 2017); *see also Hexemer v. Gen. Elec. Co.*, No. 1:12-CV-1808 LEK/CFH, 2015 WL 3948418, at *5 (N.D.N.Y. June 29, 2015) ("In

---

[11] Unless otherwise indicated, internal citations, quotation marks, and other alterations are omitted throughout in text quoted from court decisions.

retaliation cases, courts should be especially cautious before granting summary judgment where, more often than not, it is the employer's intent that is in question.").

### III. DISCUSSION

#### A. Prima Facie Case

To establish a prima facie retaliation case, Plaintiff must demonstrate that "(1) [he] was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). Plaintiff's burden of establishing a prima facie case is de minimis. *Hicks v. Baines*, 593 F.3d 159, 164-65 (2d Cir. 2010). At oral argument, Defendants conceded that Plaintiff was engaged in protected activity by filing both his internal and administrative complaints, and there is no dispute that Defendants were aware of such complaints.

#### 1. Adverse Action

Adverse employment actions are those that "well might ... dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68(2006). In determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

The loss of paid holidays discipline imposed on Plaintiff, as well as the January 18, 2021 transfer of Plaintiff to command of a division with significantly fewer officers, are claimed to be sufficiently adverse that they might dissuade a reasonable worker from engaging in protected activity. Defendants maintain that imposing discipline resulting in a loss of five paid holidays is too minimal dissuade an officer from making a complaint. Defendants provide no caselaw supporting this claim, and courts in this Circuit have found similar

circumstances to constitute an adverse action for purposes of a retaliation claim. *See, e.g.*, *Pfeiffer v. Lewis Cnty.*, 308 F. Supp. 2d 88, 109 (N.D.N.Y. 2004) (finding that refusal to allow employee to use sick leave days was an adverse action); *Pesce v. Mendes & Mount, LLP*, No. 19-CV-4922 (JPO), 2020 WL 7028641, at *6 (S.D.N.Y. Nov. 30, 2020) (plaintiff's "loss of personal benefit days may constitute a material adverse action.").

Moreover, while transferring the Plaintiff to command of a smaller division is not a demotion, the significant reduction in officers under his command could constitute a negative change in his job status, which is sufficient to demonstrate adverse action for a prima facie case. *See de la Cruz v. New York City Hum. Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir. 1996) ("DSS returned de la Cruz to his normal civil service rank without any cut in pay and transferred him to the Foster Care Unit. He contends that by transferring him from the Adoption Unit to the Foster Care Unit, defendants moved him from an 'elite' division of DSS, which provided prestige and opportunity for advancement, to a less prestigious unit with little opportunity for professional growth. Appellees argue that the two units are equal in status. Although de la Cruz's case is in this respect quite thin, the transfer arguably altered the terms and conditions of his employment in a negative way. This is sufficient to satisfy the third prong of the *McDonnell Douglas* prima facie test.").

### 2. Causal Connection

Plaintiff claims that the temporal proximity between his protected activity and the adverse actions supports an inference of a causal relationship. The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001). Plaintiff's internal complaint against Garcia was filed July 20, 2020, Garcia was made acting Chief on September 10, 2021, and

Plaintiff's transfer occurred on January 18, 2021. Garcia's enforcement of overtime restrictions, her denial of a printer and cable television for Community Services, and the diminution of Plaintiff's school-related responsibilities also occurred in the months after Plaintiff engaged in protected activity. Plaintiff filed his complaints to the EEOC and CHRO on February 23, 2021, and while the OIA report is dated October 28, 2020, Garcia improperly waited to give notice of departmental charges against Plaintiff until May 12, 2021, after he filed his administrative complaints. (Pl.'s Opp'n at 28, citing Ex. 27 [Doc. # 37-30].) Garcia made a final determination of policy violation and imposed discipline on Plaintiff in August 2021. Plaintiff meets his minimal burden of establishing a prima facie case of retaliation as to these allegations.

### B. Legitimate Non-Discriminatory Purpose

Once Plaintiff has made out a prime facie case of retaliation, the burden shifts to Defendants to articulate legitimate non-discriminatory reasons for all the actions highlighted by Plaintiff. This burden "is not a particularly steep hurdle" because "[i]t is not a court's role to second-guess an employer's [business or] personnel decisions, even if foolish, so long as they are non-discriminatory." *Brierly v. Deer Park Union Free Sch. Dist.*, 359 F. Supp. 2d 275, 291 (E.D.N.Y. 2005). Defendants focus on the need to reduce overtime costs as justification for restricting Plaintiff's overtime usage, and deny such restrictions were applied in a knowingly inconsistent manner. (Defs.' Mem. at 25.) They state that the removal of SRO officers from Blackwell's command was precipitated by complaints regarding Plaintiff by the Superintendent. (*Id.* at 26.) And they argue the transfer of Blackwell to Administrative Services, which impacted all five captains, was done to enhance those captains' prospects for career advancement, noting that the BPD career development policy contains a provision that provides, "[t]hrough transfers, spread expertise throughout the department." (Defs.' Mem. at 5, citing Plaintiff's Ex. 11 [Doc. # 37-14] at 3.)

### C.     Pretext

Once the employer proffers a legitimate, non-retaliatory reason for a challenged employment action, the employer "will be entitled to summary judgment . . .unless the plaintiff can point to evidence that reasonably supports a finding of prohibited [retaliation]." *James v. NY Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). "While temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext. Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact." *Monachino v. Bair*, 481 F. App'x 20, 22 (2d Cir. 2012).

The Court does not find any triable evidence of pretext as it relates to Garcia's enforcement of overtime restrictions (which precluded Plaintiff's involvement in certain official activities) and the diminution of Plaintiff's school-related responsibilities. The record is undisputed that Garcia was attempting to cut department costs, particularly overtime, and took action applying to all captains once notified Captain Fitzgerald was failing to comply with her overtime policy. Plaintiff fails to show any instance where Garcia enforced overtime rules unevenly. Moreover, the record is undisputed that the removal of SROs from Blackwell's command was in response to the request of the Superintendent of Bridgeport Schools, and Captain Blackwell's substantive disagreement with the Superintendent's concerns does not constitute evidence of Defendants' pretext.

However, drawing all reasonable inferences in favor of the Plaintiff after reviewing various alleged retaliatory actions in the aggregate, the Court concludes there is sufficient evidence to allow a reasonable jury to find that prohibited retaliation occurred.

Plaintiff filed his complaints with the EEOC and CHRO on February 23, 2021, and while the OIA report was sent to Garcia on October 28, 2020, Garcia did not give notice of charges against Plaintiff until May 12, 2021, after Plaintiff filed his administrative complaints. (Pl.'s

Opp'n at 28, citing Ex. 27.) Plaintiff highlights that he only became a subject of the investigation late in the process (Pl.'s Opp'n at 37-38), though Defendants argue there is nothing improper about OIA investigating a police officer for misconduct who was not the initial subject of the investigation. (Defs.' Reply [Doc. # 41] at 8.)

Regardless of the merits of the investigation, an OIA investigation is subject to the time requirements contained in the City's collective bargaining agreement with the police union. (Pl.'s Ex. 22, Disciplinary Protocol [Doc. # 37-25].) The OIA report violated disciplinary policies requiring all internal affairs investigations be completed within 120 days of their inception. (*Id.*) Sgt. Klesyk's report is dated October 28, 2020, over fourteen months after OIA was directed by Chief Perez on August 19, 2019 to commence an investigation into the underlying incident. (Pl.'s Ex. 25 at 1.) While investigations may go further than 120 days where the City provides a written explanation to the union of legitimate business reasons for the delay (Pl.'s Ex. 22 at 3), Defendants have not produced any such written explanation. Moreover, that same investigations policy requires the Chief to notice a hearing on charges no later than 30 days after the Chief is in receipt of the OIA report (*id.*), but Garcia did not notice charges of Blackwell until May 12, 2021, well after 30 days had passed. (*See* Pl.'s Ex. 27.) When asked in her deposition about why she was so delayed in taking action after receiving the October report, Garcia made the dubious claim that the October 28, 2020 date on the OIA report likely reflects the date that OIA started drafting the report, not the date it was sent to her (Garcia Dep. Tr. [Doc. # 37-3] 18:9-21:8), even though the report states at the top that it is from OIA's investigator to Garcia dated October 28, 2020. (Pl.'s Ex. 25.) Based on these prolonged and inappropriate delays in the investigatory process, and lack of a cogent explanation, a jury could reasonably infer that Garcia only decided to follow through with imposing discipline on Blackwell *after* he filed his administrative complaint.

Moreover, it is clear that Captain Blackwell was transferred to a department with significantly reduced supervisory responsibilities, and Defendants provide only minimal

14

evidence explaining the purpose for this transfer. Plaintiff's internal complaint against Garcia was filed July 20, 2020, Garcia was made acting Chief on September 10, 2021, and Plaintiff's transfer occurred on January 18, 2021. While it is undisputed that all captains were transferred, and that department policy urges the use of transfers to spread expertise, the fact remains that Blackwell was transferred to a department with significantly reduced supervisory authority, and Defendants have provided no documentation that demonstrates the reasoning for why the captains were transferred into the specific roles they were assigned. Moreover, Blackwell states that following his transfer out of the Administrative Services division, no new captain was assigned to that Division, supporting his claim that the Division was not actually in need of a captain's oversight. (Blackwell Aff. ¶ 52.) Based on the sparse record justifying the particulars of Garcia's transfer decision, assessment of the credibility of Garcia's testimony is essential to determine whether the transfer was motivated by retaliatory animus, and that is the role of a jury and not for this Court to make on summary judgment. Finally, Blackwell maintains that Community Services had its cable television removed while the Patrol Division did not. (*Id.* ¶ 32.) This evidence, while hardly overwhelming, could assist jurors in determining whether retaliatory animus motivated Defendants' actions towards Blackwell.

### IV.   Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of August, 2023